## LADEN et al. v. METROPOLITAN DISTRIBUTING CO., Inc.

### (Circuit Court of Appeals, Third Circuit. February 1, 1922.)

### No. 2758.

Bills and notes ⬤⟹509—In action against maker and indorser of check, defendants held entitled to show whole transaction.

In an action against the maker and indorser of a check on which the maker had stopped payment, where plaintiff claimed as an innocent holder for value, to whom the payee had indorsed and delivered the check in part payment for merchandise, defendants *held* entitled to show the entire transaction and to introduce evidence tending to show that the sale of the merchandise was to the maker of the check, through the payee as a broker, who in accepting and indorsing the check acted as plaintiff's agent with plaintiff's knowledge, and that plaintiff's only right of action was against the maker of the check on the contract of sale.

In Error to the District Court of the United States for the District of New Jersey; Joseph L. Bodine, Judge.

Action at law by the Metropolitan Distributing Company, Inc., against Samuel R. Laden and Morris Snyder. Judgment for plaintiff, and defendants bring error. Reversed.

Barney Larkey and Merritt Lane, both of Newark, N. J., for plaintiff in error Snyder.

Harold Simandl, of Newark, N. J., for plaintiff in error Laden.

Jos. G. Cohen, of New York City, for defendant in error.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

BUFFINGTON, Circuit Judge. In this case the Metropolitan Distributing Company brought suit against Morris Snyder, the drawer, and Samuel R. Laden, the payee and indorser, of a check, to recover $5,000, the amount thereof. The case resulted in a verdict against both men for the full amount, and, on entry of judgment on the verdict, this writ of error was sued out.

As the case was tried, we do not think the decisive, underlying issue was submitted to or passed on by the jury, and as it goes back for retrial we deem it proper to point out that issue, with a view to aiding in the future retrial, rather than of now entering on a detailed discussion of the assignments of error in the past trial.

Turning, then, to the proofs, there was testimony which tended to show that the plaintiff, the Metropolitan Distributing Company, a corporate citizen of the state of New York, was, on August 19, 1920, the owner of 1,000 cases of bottled in bond whisky, which was stored in a United States bonded warehouse at the distillery of the A. McGinnis & Co. at Carrollton, Md. This whisky they were willing to sell at $30 per case, f. o. b. distillery, the buyer "to deliver to seller or distillery a properly authenticated United States internal revenue purchase permit in the name of A. McGinnis & Co., of Carrollton, Md."

Laden, one of the defendants, was a broker, and with a view of earning a commission of $1 a case on the whisky, he approached the plaintiff company to ascertain whether, if the whisky was bought by Sny-

der, the other defendant, at $31 per case, he (Laden) would get a commission of $1. This being agreed to by the plaintiff company, Laden indorsed and turned over to the plaintiff company a check of even date for $5,000, drawn by Snyder, the other defendant, and a paper in the form of a receipt, signed by the plaintiff and marked "Accepted, Samuel R. Laden," was passed between the parties. This paper, which is in the form of a receipt, recites in substance that the plaintiff has "received from Sam Laden * * * a check for $5,-000, issued by Morris Snyder and indorsed by Mr. Sam Laden, as part payment for 1,000 cases McGinnis whisky bottled in bond at $30 per case, f. o. b. Distillery." This paper, it will be observed, fixed the price of the whisky, as between the plaintiff and Laden, at $30 per case, and in that regard tends to support the contention that its purpose was merely to evidence the agreement of the plaintiff that Laden was to receive $1 per case as a commission, if Snyder bought at $31.

At this point we note that the contention of Laden, as above stated, namely, that the paper was simply a part of the whole transaction, and was merely intended to secure him a $1 commission in case Snyder bought at $31, and that, as Laden contends, he was a mere broker, a "go-between," as he expressed it, between the plaintiff and Snyder, becomes all-important, for the contention of the plaintiff is that Laden was the real and only purchaser, and that the $5,000 check of Snyder was paid by Laden to the Distributing Company as part payment for the whisky sold him; that the plaintiff had no dealings with Snyder, and was therefore an innocent holder for value of Snyder's check, and under the New Jersey statute (3 Comp. St. 1910, p. 3742, § 61), as quoted in the margin[1] was entitled to recover for the check. This underlying and all-important question of fact, namely, whether there was a sale by the Distributing Company to Laden, or whether the sale was made by the Distributing Company to Snyder, was not submitted to or passed on by the jury. Its decisive relation to the controversy is apparent on two grounds: First, if the paper was only a part of the whole transaction, and its purpose was, as between the plaintiff and Laden, to fix the commission, and Laden was the broker, agent, or "go-between," to sell the whisky to Snyder at $31, and the sale was in reality a sale by the Distributing Company to Snyder, then, Laden being the agent of the plaintiff, and indorsing and turning over to his principal the check which had come into his hands as such agent, he should not be held as an indorser, within the meaning of the statute; and, secondly, if Laden was acting as the agent, broker, or "go-between" to effect a sale by the plaintiff to Snyder, then the check, coming into the hands of the plaintiff's agent, Laden, and subsequently into its hands through such agent, as a payment on account of its sale to Snyder, Snyder could stop payment, because the New Jersey

---

[1] "The drawer by drawing the instrument admits the existence of the payee and his then capacity to indorse, and engages that on due presentment the instrument will be accepted or paid, or both, according to its tenor, and that if it be dishonored, and the necessary proceedings on dishonor be duly taken, he will pay the amount thereof to the holder, or to any subsequent indorser who may be compelled to pay it; but the drawer may insert in the instrument an express stipulation negativing or limiting his own liability to the holder.'"

act did not prevent his doing so. But in such case the seller had the right to refuse to perform the contract, and sue for full payment and performance. Seeing, then, the significance of this underlying issue of the sale, whether one to Laden or one to Snyder, the materiality of showing the whole transaction, the fact that the plaintiff knew of the whole transaction, that Snyder was the real buyer, that the check was not turned over to the plaintiff until after Snyder had agreed to buy at $31, that an additional paper was drawn whereby Snyder was to pay $31, all became proper matters of proof. In this regard the significance of the record, and the relevancy of the excluded testimony, becomes clear when the record, quoted in the margin, is examined.[2]

[2] "Q. What did you [Laden] state to him? This was at the time that the check, Exhibit P-2 was handed over to Mr. Goldberg; is that right? A. I came into the Metropolitan Distributing Company and told Mr. Goldberg that Mr. Snyder wanted to buy a thousand cases of McGinnis, and told him that price that Mr. Snyder was willing to pay for the stuff—$31. I said, 'Mr. Goldberg, what is in it for me?' We dickered, and he said, '$30 to me, and $1 if the deal is closed; you get $1 out of it.' I said, 'All right, Mr. Goldberg; it goes.' I turned over the check to Mr. Goldberg and he drew up a contract.

"Q. You did not turn over the check right then and there? A. No.

"Q. You went back to Newark; did you go back to Newark then? A. Absolutely, sure.

"Q. Did you see Mr. Snyder? A. I did.

"Q. And at that time what price did you quote him? A. Thirty-one dollars.

"Mr. Cohen: I object to that as incompetent, immaterial, and irrelevant, and not binding on the plaintiff.

"The Court: I do not think what he said to Mr. Snyder is competent, so I will strike that out.

"Q. Now relate the rest of your conversation with Mr. Goldberg.

"The Court: I want him to give me the rest of the conversation with Mr. Goldberg. A. When I agreed with Mr. Goldberg to pay him $31 for the merchandise, then I was to get $1 back as the go-between.

"Q. Who was buying the stuff? A. Mr. Snyder was buying the stuff from the Metropolitan.

"Q. I see. Now, you gave Mr. Goldberg the check which has been marked Exhibit P-2; that check was given to you by Mr. Snyder? A. Yes; and in turn turned it over to Mr. Goldberg.

"Q. To Mr. Goldberg that morning? A. Yes.

"Q. Then did you do anything else? A. Well, then Mr. Goldberg gave me an agreement.

"Q. By an agreement you refer to the paper which has been marked Exhibit P-3 in evidence? A. I don't know just which one of these it was.

"Q. Is this the agreement (handing witness Plaintiff's Exhibit P-3)? A. Yes; that is the agreement, and there is another one.

"Q. You signed that agreement, did you? A. Yes; I signed one, and Mr. Goldberg signed one.

"Q. Is that Mr. Goldberg's signature on that paper? A. Yes.

"Q. And at the time you signed that, what, if anything, did you tell him as to the buyer of that liquor? A. Mr. Snyder was the buyer of the merchandise. * * *

"By the Court: Q. Did you give Mr. Snyder anything for that check of $5,000 which is Exhibit P-2? A. Well, the only thing I gave him was the receipt that I received from Mr. Goldberg. I did not give him anything else.

"Q. What was that receipt? A. The receipt that the goods are secured with the Metropolitan Distributing Company for 1,000 cases of McGinnis, lying at the McGinnis Distillery Company, in Maryland.

"Q. Where is that receipt? A. I don't know what became of it. I turned my receipt over to his people.

Such being the proofs, it is clear there was testimony tending to show that Snyder, and not Laden, was the real buyer from the plaintiff, and that the check was received by Laden as the agent of the plaintiff, and was not delivered by Laden to the plaintiff as part payment on a sale made by the plaintiff to Laden. And such testimony should have been admitted in full, the jury instructed that if they so found, and the real transaction was a sale by the Metropolitan Distributing Company to Snyder, and that the check, while given in form to Laden, was in reality given to the Metropolitan's agent, Laden, as a part payment on the sale by the Metropolitan to Snyder, then and in that event the transaction was in substance not different than if the check had been given by Snyder direct to the Metropolitan, and therefore liable to stoppage before payment, and that, having been stopped, the Metropolitan could then repudiate the sale, because the hand money was not paid, or stand upon the contract with Snyder and sue him for the breach.

The judgment is therefore reversed.

"Q. To what people? A. To Mr. Snyder.

"Q. You gave Mr. Snyder a receipt? A. I offered him a receipt and I gave it to him.

"By Mr. Unger: Q. Your receipt? A. The transaction that took place between Snyder, me, and the Metropolitan, the deal that I closed *for Snyder with the Metropolitan.* * * *"

Cross-examination by Mr. Cohen:

"Q. Mr. Laden, I understood you to testify that you told Mr. Goldberg, at the time you negotiated this deal, that you were acting as an agent; is that correct? A. Well, I was acting in the affair to help the two of them come together and to close the deal, and I was to get $1 for every case that was bought between Mr. Snyder and Mr. Goldberg.

"Q. In other words, any agreement of sale that may have been made, or that was to be made, was to be made between the Metropolitan Distributing Company and Mr. Snyder? A. I was the go-between; yes.

"Q. But they were the principals in the transaction? A. Absolutely.

"Q. That is, in other words, Snyder was the buyer and Mr. Goldberg was the seller? A. Mr. Snyder was the buyer, and Mr. Goldberg was the seller; yes, sir.

"Q. All right. Now, the purchase price to Mr. Snyder was to be $31,000? A. Thirty-one thousand dollars.

"Q. That is, $31 a case? A. Yes.

"Q. Now, at that time you were acting for Mr. Snyder, were you not? A. I was acting for Mr. Goldberg, as well as for Mr. Snyder. * * *

"Q. In other words, signed another paper, in which the price was $31 a case. A. Absolutely. * * *

"Q. Mr. Laden, I understand you to say that you delivered a writing to Mr. Snyder, in which it was stated that the goods were sold for $31 a case? Is that right? A. I am sure that it was a paper either for $30— I am not quite sure, but there was an additional paper drawn for $31, or it was the same paper for $30; but I really believe that there was an additional paper drawn between Goldberg to Snyder. I think, I am not sure about it, there was an additional paper drawn whereby Mr. Snyder was to pay $31."